United States District Court

For the Northern District of California

1

2

3

4

5

6          IN THE UNITED STATES DISTRICT COURT

7

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   ALLEN THOMAS, III,                              No. C 12-5894 WHA (PR)

11              Petitioner,                          **ORDER DENYING PETITION FOR
                                                     WRIT OF HABEAS CORPUS AND
12     v.                                            CERTIFICATE OF
                                                     APPEALABILITY**
13   J. SOTO, Warden,

14              Respondent.

15   _____/

16                              **INTRODUCTION**

17          Petitioner, a California prisoner proceeding *pro se*, filed a petition for a writ of habeas

18   corpus challenging his conviction pursuant to 28 U.S.C. 2254.  Respondent was ordered to

19   show cause why the writ should not be granted based upon petitioner's due process claims.

20   Respondent has filed an answer and a memorandum of points and authorities in support of it.

21   Petitioner has not filed a traverse although given an opportunity to do so.  For the reasons set

22   forth below, the petition is **DENIED**.

23                              **STATEMENT**

24   **I.     PROCEDURAL BACKGROUND**

25          In August 2009, Petitioner was charged with murder and arson of an inhabited dwelling.

26   The information alleged that petitioner used a deadly weapon and committed felony murder in

27   the course of a robbery and in the course of a burglary, and committed murder while engaged in

28   the commission of rape by instrument.  The information also alleged that petitioner had four

United States District Court

For the Northern District of California

1    prior convictions and a prior strike conviction.  A jury convicted petitioner of first-degree

2    murder and arson, and found true the attendant allegations.  The court found true a prior robbery

3    conviction.  On August 6, 2010, the trial court sentenced petitioner to a determinate term of 16

4    years and an indeterminate term of life without the possibility of parole.

5          In an unpublished opinion, the Court of Appeal affirmed the judgment on March 20,

6    2012 (Ex. 2).  The California Supreme Court denied a petition for review on June 13, 2012 (Ex.

7    7).  Petitioner filed the instant federal petition on November 19, 2012.

8    **II.    FACTUAL BACKGROUND**

9          The following facts are taken from the California Court of Appeal opinion:

10   Mrs. Pierre, defendant Allen Thomas's great aunt, owned a two-story Victorian-
     style duplex in Oakland.  She and her late husband lived upstairs.  Defendant's
11   mother, Ruby Thomas, and her nine children, including defendant, moved into
     the lower unit in 1989 or 1990.  Defendant lived in the house for years,
12   sometimes staying with Mrs. Pierre and sometimes with his mother.  However,
     Ruby Thomas had moved out in mid-August of 2007.
13
     In October of 2005, Mrs. Pierre and defendant's sister, Samantha Easiley, saw
14   defendant rummaging through Mrs. Pierre's purse for money when he was high
     on drugs.  In June of 2006, Mrs. Pierre obtained a restraining order against
15   defendant. [FN2] Thereafter, defendant was prohibited from being on or near
     Mrs. Pierre's property.  However, Mrs. Pierre allowed him to come back
16   occasionally.  He came on the property to help his mother move out, and he kept
     his insulin Pierre's refrigerator.  Defendant had been living with Mrs. Pierre on
17   and off for about a year at the time of her death.  He also lived in his car, which
     he kept in a parking lot about a four minute walk from Mrs. Pierre's house.  In
18   the last six months before Mrs. Pierre's death, defendant was smoking crack
     from a crack pipe once or twice a week. [FN3]  In mid-July of 2007, Mrs. Pierre
19   asked Samantha, "Baby, do you think next time he gon' kill me?"  Samantha had
     heard Mrs. Pierre say that once before.
20
21          FN2. Certified copies of the restraining order and transcript of the
            hearing on the petition were admitted into evidence as Exhibit 53.  In it,
22          Mrs. Pierre averred that on May 19, 2006 at approximately 5:00 a.m.,
            defendant entered her house without permission and startled her awake
23          by hovering over her while she slept.  He told her he was "getting her
            purse."  When Mrs. Pierre started screaming and grabbing her purse,
24          defendant started shaking her.  Her nephew Seneca came to her aid, and
            defendant ran away.

25          FN3. Lester Huff, an acquaintance of defendant who lived in his van in
            the same parking lot where defendant parked his car, also saw defendant
26          use crack cocaine once or twice a week in the three-to-six month period
            before September of 2007.
27
28   The night before Mrs. Pierre was killed, defendant was drinking beer with Mrs.
     Pierre's longtime neighbor, 87-year-old Frank Carswell.  Defendant told
     Carswell that he was "going to kill the bitch" – meaning Mrs. Pierre – because

                                         2

she had stolen his "Vietnam money." [FN4]  This was not the first time defendant had told Carswell he was going to kill his great aunt; he had said that four or five times before.

> FN4. Petitioner joined the military shortly after graduating high school. He received some monetary compensation for Agent Orange exposure, which Mrs. Pierre was supposed to keep for him.

On the evening of September 13, 2007, defendant drank one or two 12-ounce Bud Light beers with Lester Huff.  Later that night, Huff saw someone come into the parking lot and go to defendant's car.  Between 11:30 p.m. and 12:30 a.m., he saw defendant leave the lot with someone.  Defendant did not appear to be drunk, but Huff couldn't tell if defendant was intoxicated or high.

*The Fire*

At 1:00 a.m. on September 14, 2007, firefighters responded to a fire at Mrs. Pierre's house.  Smoke was billowing from the evens of the house, and firefighters had to force open locked doors to enter.  There were no signs of forced entry other than by the firefighters.  Inside, they discovered Mrs. Pierre's body on the floor in front of the bed in the bedroom and took her outside.  Mrs. Pierre's body was "pretty heavily burnt."  She was not breathing, and had no pulse or heart activity.  She was wearing only a top. [FN5]  Because she had lacerations to her body and head, the Oakland police were called.  An arson investigator was also called.  Neither the firefighters nor the paramedics removed any clothing from the body.

> FN5. According to Samantha Easiley, Mrs. Pierre typically wore a knee-length nightgown to bed without undergarments.

The arson investigation revealed that smoke detectors in the kitchen had been broken or dismantled.  In the bedroom, the bed was burned as a result of an ignitable liquid being poured on it.  The carpet was saturated with an ignitable liquid, as well as blood.  An ignitable liquid was also used in a corner of the bedroom, where a charred nightstand stood.  The fire had traveled from the bed to the ceiling.  At trial, the arson investigator opined that the fire was set with some type of ignitable liquid, possibly gasoline; an accelerant had been used to set the fire.  Accelerant had also been poured on Mrs. Pierre.  The fire had been set around the bed, on the bed, and on top of the victim.

*The Autopsy Findings*

Mrs. Pierre was 89 years old and had suffered burns on 85 to 90 percent of her body, but the causes of death "were multiple stab wounds and incised wounds associated with multiple blunt injuries."  Her face was bruised and lacerated. The bones in her nose, upper and lower jaw, and left cheekbone were fractured, and her dentures were broken.  A pipe wrench can cause blunt force injuries.

She also had both stab and incised wounds.  [FN6]  These included: (1) a stab wound in her right lower back; (2) an incised wound in her right front neck; (3) stab wounds in the left front chest; (4) stab wounds in the midline, to the front side of the chest; (5) another stab wound in the right front side of the chest; and (6) a stab wound on the left front side of the abdomen.  A wound just outside the right eye area was probably a stab wound (rather than a blunt force injury), as were probably the wounds in the area of the left eyebrow, two wounds on the left side of the face, near the left eye, and two more wounds on the left side of the

3

**United States District Court**

For the Northern District of California

1
2
chin. In addition, there were a total of six incised wounds in the area of the vagina, including wounds on the left and right of the vaginal opening, inside the vagina extending close to the cervix, and the clitoris.

3
FN6. An incised wound is longer than it is deep. Conversely, a stab wound is deeper than it is long on the surface of the skin.

4

5
6
7
One of the stab wounds in the front side of the chest penetrated eight to 10 inches and passed though the breast bone, the heart, the aorta, the right lung, a rib, and the soft tissue of the back, exiting on the right back side of the body. This wound damaged the left chamber, the left ventricle, and the aortic valve of the heart, and would have caused death within three to five minutes. Two other stab wounds also penetrated the heart.

8
9
All of these wounds hemorrhaged, indicating that Mrs. Pierre was alive when the injuries were inflicted. There was no smoke or soot in the breathing system within the lungs, indicating that she was not alive when her body burned.

10
*The Police Investigation*

11
12
13
14
Inside the bedroom, police found a knife, a wrench, dentures, and money. In the kitchen, police found broken smoke detectors on the floor. There was "a pretty good degree of blood" saturating the carpet where Mrs. Pierre had been found. Outside the house, police discovered a knife in a storm drain and a discarded part of a broken smoke detector and a bloody handkerchief nearby. Mrs. Pierre's wallet was found in a garbage can.

15
16
17
Some of Mrs. Pierre's relatives, including defendant's sisters Samantha and Inez, gathered at the crime scene after hearing about the fire. Samantha told Sergeant Nolan of the Oakland Police Department that her great aunt had a restraining order against defendant. Samantha also told Nolan that "Allen was the No. 1 suspect."

18
*Defendant's Detention*

19
20
21
22
23
24
On his way back to the police station, Nola saw two apparently homeless men standing in front of a liquor store near the Pierre house and stopped to talk to them in case they had heard any rumors about the fire. Defendant identified himself as Allen. Nolan noticed three spots that looked like blood on the white T-shirt he was wearing under a puffy jacket. Defendant remarked he had "heard something happened to my aunt... over there" as he gestured toward the crime scene. Defendant was detained, and frisked for weapons; he had none, but he indicated there was a crack pipe in his sock. Defendant had blood on the top and back of his head, behind his right ear, on his ring finger and palms of both hands, and on his pants and shoes. At the time, defendant did not appear to Nolan to be under the influence of alcohol or drugs.

25
*Defendant's Statements to Police*

26
27
28
Defendant was taken to the police station and placed in an interview room shortly before 5:00 a.m. [FN7] He was *Mirandized* [FN8] and interviewed beginning at 6:52 a.m. for almost an hour. After a break, the interview resumed at 9:11 a.m. and continued until 10:38 a.m. During the interview, defendant was responsive and coherent. Defendant's blood was drawn at 4:00 p.m.

FN7. Defendant told Sergeant Nolan at that time that he had drunk two

4

16-ounce beers and one 12-ounce beer, and used a small amount of cocaine that night.

FN8. *Miranda v. Arizona* (1966) 384 U.S. 436.

During the first interview, defendant told police that the security gate and door at the front of his aunt's house were open when he got there, and a big man came out of the house and bumped into him.  There was smoke in the house and his aunt was lying on the floor, all bloody.  He panicked and ran out of the house.  He said he had handled the monkey wrench recently while doing repairs at his aunt's house.  He admitted his aunt obtained a restraining order against him because she thought he broke into her house.  According to defendant, the blood on his shirt came from touching his aunt, and the blood on his jacket was his own, from having cut himself about two weeks earlier.

In the second interview, defendant admitted that he lied about seeing a "a big dude" run out of his aunt's house.  He admitted he was upset with his aunt and sister Inez for evicting his mother.  He said his aunt's door was open when he went to her house to check on her, and they "got into it."  He picked up a monkey wrench for protection, in case someone else was there.  He called her name and she began attacking him with something in her hand.  He did not want to hit her, but he did because she kept swinging at him.  He believed he only hit her once or twice before she went down.  He checked her and she seemed "all right," but he didn't know if she was alive at that time.  He began to cry, and took a tissue to dry his tears.  The tissue caught fire when he lit a cigarette.  He dropped the tissue and ran out the door, taking Mrs. Pierre's wallet, which was empty.  He dropped it into a garbage can because he was afraid his finger prints were on it.

Later, he admitted he went into her bedroom and woke her by calling her name.  She then jumped off the bed naked and kicked him "between [the] legs."  [FN9]  He admitted he probably used a knife and stabbed his aunt in the neck and shoulder, but he repeatedly maintained throughout the second interview that it was an accident, and once called it "a mistake... a reflex."

FN9. According to Samantha, while Mrs. Pierre was healthy and active for her age, she was unable to jump, run or lunge.

Defendant adamantly denied pouring gasoline in Pierre's duplex, setting the fire or disabling the smoke detectors.  He complained he was already being blamed for the first fire at his aunt's house a year earlier, "that [he] didn't do."

*Defendant's Telephone Calls from Jail*

Defendant's calls from Santa Rita Jail were monitored and recorded.  On September 26, 2007, defendant called his sister Inez.  He told her the police were "trying to pin this shit on me...."  He said he admitted nothing.  The police wouldn't let him sleep, and [] he [was] "full of drugs and everything... alcohol, beer, cocaine, weed, you name it...."  He admitted using a monkey wrench on Mrs. Pierre because she swung at him and caught him off guard.  He said she jumped out of bed with a knife in her hand; he pushed her, and accidentally hit her "in the head."  She fell on the floor, but she was breathing.  When he left she was fine.

On October 30, 2007, defendant again called Inez.  He once more denied confessing.  He said that when he went to his aunt's house, a big man ran past

5

**United States District Court**

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

him. He said Mrs. Pierre's blood got all over him when she hit her head in the door and he grabbed her.

*Additional Physical Evidence*

A search of defendant's car yielded a pair of bloody shoes, a bloody napkin, another knife, insulin, a needle, and a Bic cigarette lighter with fluid in it, along with a piece of paper with defendant's name on it.

*DNA Evidence*

DNA samples were taken from defendant and Mrs. Pierre. DNA profiles were developed from the samples and were compared with DNA found at 16 locations.

Four of 12 bloodstains from the front, back and insides of defendant's T-shirt were randomly tested for DNA. Bloodstains A, E, F, and G contained mixed DNA. For bloodstain A, the major donor's DNA was consistent with defendant's DNA, and the minor donor's DNA was consistent with Mrs. Pierre's DNA. For bloodstains E, F and G, the major donor's DNA was consistent with Mrs. Pierre's. There was not enough information to conclusively say who the minor donor was in bloodstain E, but the minor donor's DNA was bloodstain F and G were consistent with defendant's DNA.

Three of six bloodstains on defendant's sweat pants were tested for DNA. Bloodstain A, on the bottom right leg, was consistent only with Mrs. Pierre's DNA. Bloodstain F from the inside of the front leg was consistent only with defendant's DNA. Bloodstain D, from the back bottom portion of the right leg, contained mixed DNA, of which the major donor's was consistent with Mrs. Pierre's DNA. The minor donor was not identified.

DNA typing was done on two bloodstains from the right shoe and one bloodstain from the left shoe. Bloodstains A and B, from the instep and bottom of the right shoe, contained a single donor's DNA and was consistent with Mrs. Pierre's DNA. Bloodstain C, from the toe box of the left shoe, contained incomplete DNA from which it could only be determined that Mrs. Pierre was a potential major donor and the minor donor was male. Of three bloodstains on the napkin, two were tested for DNA. One of these contained DNA consistent with Mrs. Pierre's DNA. In all of the 16 locations tested, 12 locations contained complete DNA types, and "[a]t those 12 locations they matched the DNA types for Amanda Pierre's reference sample." The statistical probability of finding the same DNA profile "from someone randomly picked from the population" across 16 locations is 1 in 444 quintillion.

Vaginal, rectal and oral swabs were collected during the autopsy. The swabs were tested for sperm; none were found.

*Other Crimes Evidence*

On December 2, 1986, defendant admitted his involvement in the robbery of a man in his 70's. Defendant said two women asked him to help them rob a man they had set up. According to the women, "the old man was half blind and could not hear too good." Defendant took a baseball bat, intending to scare the man, but when the man "came at him," defendant struck him with a bat "out of impulse." He took the man's television and VCR.

6

United States District Court

For the Northern District of California

*The Defense Case*

A toxicologist testified that the blood sample drawn from defendant reflected a fairly high reading of cocaine metabolite in his blood, indicating that defendant had ingested a "really big dose" of cocaine, or multiple doses of the substance, or the sample could have degraded.  When a binge user crashes, he or she may experience delusions or hallucinations, or become aggressive, or sleepy.  A psychiatrist who specializes in treating addictions and major mental illnesses testified paranoid psychosis can result from smoking cocaine.  He opined hypothetically that a person who had ingested 15 milligrams of crack cocaine could be paranoid enough to believe that he was being attacked by an unarmed loved one.  He also opined sexual violence is often associated with cocaine use.

*People v. Thomas*, No. A129842, slip op. at 2-10 (Cal. Ct. App. Mar. 20, 2012) (Ans., Ex. 2).

**ANALYSIS**

**I.    STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*,  537 U.S. 322, 340 (2003).

Under 28 U.S.C. 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000).  In this case, the last reasoned opinion to address petitioner's claims is that of the California Court of Appeal.

United States District Court
For the Northern District of California

1  **II.    PETITIONER'S CLAIMS**

2          As grounds for federal habeas relief, petitioner claims the following: (1) there was

3  insufficient evidence to support the conviction for first degree murder while engaged in the

4  commission of rape by instrument; and (2) application of the special circumstance statute to

5  enhance his sentence violated the Eighth Amendment.

6          **A.    INSUFFICIENT EVIDENCE**

7          The Due Process Clause "protects the accused against conviction except upon proof

8  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

9  charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

10  evidence in support of his state conviction cannot be fairly characterized as sufficient to have

11  led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a

12  constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven,

13  entitles him to federal habeas relief, *see id.* at 324.  *See, e.g., Wigglesworth v. Oregon*, 49 F.3d

14  578, 582 (9th Cir. 1995) (writ granted where Oregon procedure of allowing lab reports

15  regarding drug analyses to be admitted into evidence without authenticating testimony relieved

16  state of its burden to prove beyond reasonable doubt all elements of crime charged).

17          The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal

18  habeas proceedings . . ." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam)

19  (finding that the 3rd Circuit "unduly impinged on the jury's role as factfinder" and failed to

20  apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to

21  find that the evidence was insufficient to support petitioner's conviction).  A federal court

22  reviewing collaterally a state court conviction does not determine whether it is satisfied that the

23  evidence established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th

24  Cir. 1992), *cert. denied*, 510 U.S. 843 (1993); *see, e.g., Coleman*, 132 S. Ct. at 2065 ("the only

25  question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall

26  below the threshold of bare rationality").  The federal court "determines only whether, 'after

27  viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

28  could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982

F.2d at 338 (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of fact could have

United States District Court

For the Northern District of California

1  found proof of guilt beyond a reasonable doubt, has there been a due process violation.

2  *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d 988, 992-93 (9th

3  Cir.), *amended*, 768 F.2d 1090 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048, *and cert. denied*,

4  475 U.S. 1049 (1986); *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir.), *cert. denied*, 469 U.S.

5  838 (1984).

6          After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional

7  layer of deference. *Juan H.*, 408 F.3d at 1274.  Generally, a federal habeas court must ask

8  whether the operative state court decision reflected an unreasonable application of *Jackson* to

9  the facts of the case. *Coleman*, 132 S. Ct. at 2062; *Juan H.*, 408 F.3d at 1275 (quoting 28

10  U.S.C. 2254(d)).¹  To grant relief, a federal habeas court must conclude that "the state court's

11  determination that a rational jury could have found that there was sufficient evidence of guilt,

12  i.e., that each required element was proven beyond a reasonable doubt, was objectively

13  unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964-965 (9th Cir. 2011).

14          The California Court of Appeal found there was sufficient evidence to support the

15  conviction and rejected the claim.

16      Defendant contends there was insufficient evidence to support the finding of the
    rape by instrument special circumstance.  We apply the substantial evidence rule
17      to defendant's challenge to the special circumstance finding.  "The rules
    governing sufficiency of the evidence are as applicable to challenges aimed at
18      special circumstance findings as they are to claims of alleged deficiencies in proof
    of any other element of the prosecution's case. [Citation.]" (*People v. Morris*
19      (1988) 46 Cal.3d 1, 19, disapproved on another point in *In re Sassounian* (1995) 9
    Cal.4th 535, 543-545.)  "We must therefore determine here whether, viewing the
20      evidence in the light most favorable to the prosecution, any rational trier of fact
    could have concluded that defendant had a purpose for the [rape] apart from the
21      murder. [Citations.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 183.)  The
    evidence is sufficient if it establishes that the defendant committed the murder
22      and the rape by instrument with "independent, albeit concurrent, goals." (*People
    v. Clark* (1990) 50 Cal.3d 583, 609 (*Clark*).)

23
    Defendant argues that for the special circumstance to apply, he must have formed
24      the concurrent intent to commit the rape by instrument prior to or during the

25

26      ¹Prior to *Juan H.*, the Ninth Circuit had expressly left open the question of whether
    28 U.S.C. 2254(d) requires an additional degree of deference to a state court's resolution of
27  sufficiency of the evidence claims. *See Chein v. Shumsky*, 373 F.3d 978, 982-83 (9th
    Cir.2004) (en banc); *Bruce*, 376 F.3d at 956-57.  But in *Juan H.*, the court concluded that
28  "the Supreme Court's analysis in *Williams* compels the conclusion that the state court's
    application of the *Jackson* standard must be '"objectively unreasonable.'" *Juan H.*, 408 F.3d
    at 1275 n.13 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000)).

9

**United States District Court**
For the Northern District of California

1  commission of the acts that resulted in Pierre's death.  At most, he argues, the
evidence "shows [defendant] committed a rape by instrument only after he
2  already struck the killing blows that caused Pierre's death."  In support of this
argument, defendant points to his statement admitting that he stabbed Mrs. Pierre,
3  but only near her head and shoulder.  Defendant posits that since the prosecutor
relied in part on defendant's version of the sequence of events during argument,
4  and did not present any evidence to directly contradict or impeach this scenario,
the People are bound by defendant's exculpatory version of events.  (*People v.*
5  *Toledo* (1948) 85 Cal.App.2d 577 (*Toledo*); superseded in part as stated in *People
v. Burney* (2009) 47 Cal.4th 203, 248-249 (*Burney*).)

6

7  Assuming without deciding that the "antiquated and questionable statement of the
law" for which defendant cites *Toledo* has continuing vitality (*Burney, supra,* 47
Cal.4th at p. 248), defendant's version of events was not the only evidence
8  concerning the sequence of events.  The pathologist's findings could not establish
the order in which the stab wounds were inflicted; however, his findings did
9  establish that *all* of the stab wounds hemorrhaged, reflecting that Mrs. Pierre was
still alive when the wounds in and around the vaginal opening were inflicted.
10  Thus, even inferring from defendant's statement to police that the stab wounds
and blows to the head and shoulder were inflicted before the stab wounds to the
11  vagina, that statement fails to dispel the reasonable inference that defendant
formed the intent to rape before or during the murder.

12

13  Defendant acknowledges that evidence of concurrent intents to rape and kill can
support a special circumstance finding, and that, "[i]n fact, that was the People's
theory" here.  Defendant disputes the existence of substantial evidence supportive
14  of concurrent objectives or intents.  He argues that substantial evidence for a
concurrent intent to rape is absent because (1) defendant had never previously
15  tried to rape his aunt although he had broken into her house to steal from her; (2)
Mrs. Pierre feared the next time he broke in he would kill her, but not that he
16  would sexually abuse her; (3) he never threatened to sexually abuse her, although
he did threaten to kill her; and (4) he had prior theft-related convictions, but no
17  prior sex offenses.  Defendant also disputes that Mrs. Pierre's state of undress
from the waist down supports an inference of independent intent on his part
18  because other testimony established that Mrs. Pierre slept without underwear or
pajama bottoms.  Finally, defendant admits this "leaves only the fact that her
19  genital area was viciously stabbed, half a dozen times," but argues that this
evidence does not establish a concurrent intent to rape because, by his own
20  admission, defendant had already bludgeoned Mrs. Pierre with a wrench and
stabbed her near the head and shoulder; thus, he did not form the intent prior to or
21  during the commission of the acts that resulted in Mrs. Pierre's death.

22  The jury could view the facts differently.  The evidence that Mrs. Pierre was still
alive when she was stabbed in the vagina, and that the wounds to her heart and
23  aorta likely would have killed her within three to five minutes, sufficiently
establish that defendant formed the intent to rape his great aunt with the knife
24  prior to or during the murder.  Furthermore, the viciousness of the attack and the
number and type of wounds to her vaginal area and clitoris amply supports the
25  inference that defendant formed the intent to mutilate and humiliate Mrs. Pierre
sexually, independently of, and not incidentally to, the intent to kill her.  In our
26  view, the evidence is sufficient to establish that defendant raped and killed the
victim with "independent, albeit concurrent, goals."  (*Clark, supra,* 50 Cal.3d at
27  p. 609, fn. Omitted.)  We, therefore, reject defendant's claim of evidentiary
insufficiency.

28

(Ans., Ex. 2 at 10-12.)

**United States District Court**
For the Northern District of California

1    Petitioner's claim is without merit because the state appellate court's determination that

2    the jury could find there was sufficient evidence of guilt based on the evidence presented was

3    not objectively unreasonable. *Boyer*, 659 F.3d at 964-965. Petitioner claims that the "sexual

4    assault on [Mrs.] Pierre (based on the stabbing of her genital area) was incidental to her

5    murder." (Pet. 38.) However, as discussed by the state appellate court, the pathologist's

6    findings established that all of the victim's wounds hemorrhaged, "reflecting that Mrs. Pierre

7    was still alive when the wounds in and around the vaginal opening were inflicted." *See supra* at

8    3-4, 10. This evidence coupled with the viciousness of the attack and the number and type of

9    wounds inflicted to the victim's genital area was sufficient for the jury to infer that petitioner

10   intended to sexually mutilate Mrs. Pierre, "independently of, and not incidentally to" intending

11   to kill her. *Ibid.* Viewing the evidence in the light most favorable to the prosecution, any

12   rational jury could have found the essential elements of the crime at issue beyond a reasonable

13   doubt. *Payne*, 982 F.2d at 338. Accordingly, this claim is DENIED as without merit.

14           **B.     EIGHTH AMENDMENT CLAIM**

15           Petitioner's second claim is that the application of the special circumstance statute,

16   California Penal Code section 190.2, to enhance his sentence violated the Eighth Amendment.

17           The California Court of Appeal rejected this claim under binding state law.

18           Defendant argues that the special circumstance statute, Penal Code section 190.2,
             subdivision (a), violates the federal constitution's Eighth Amendment because it
19           "impermissibly broaden[s] the class of persons subject to the death penalty by
             essentially including the entire class of persons who were also guilty of first-
20           degree murder on the same theories." Defendant acknowledges that our Supreme
             Court has "Consistently rejected the claim that the statutory special
21           circumstances, including the felony-murder special circumstance, do not
             adequately narrow the class of persons subject to the death penalty" (*People v.
22           Pollock* (2004) 32 Ca,.4th 1153, 1195), and has repeatedly authorized "use of a
             felony to qualify a defendant both for first degree murder and for a special
23           circumstance...." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1183.) He raises the
             issues in his brief in order to preserve them for federal review. As an
24           intermediate appellate court, we are bound by stare decisis to follow California
             Supreme Court precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57
25           Cal.2d 450, 455.) Therefore, we find the special circumstance statute is
             constitutional.

26   (Ans., Ex. 2 at 12.)

27
             If the state court only considered state law, the federal court must ask whether state law,
28
     as explained by the state court, is "contrary to" clearly established governing federal law. *See*

                                                    11

1 *Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001). The state appellate court rejected

2 petitioner's claim under California Supreme Court precedent which upheld the felony-murder

3 special circumstances statute. *See People v. Pollock*, 32 Cal.4th at 1195. Furthermore, as

4 respondent points out, the United States Supreme Court has never sustained a constitutional

5 attack on section 190.2, and has specifically rejected the argument that it is unconstitutionally

6 vague. *See Tuilaepa v. California*, 512 U.S. 967, 975-80 (1994). Petitioner has failed to file a

7 traverse and point to other clearly established federal law which supports a different conclusion.

8 Accordingly, it cannot be said that the state court's rejection of this claim was contrary to, or

9 was an unreasonable application of, clearly established Supreme Court authority. This claim is

10 DENIED as without merit.

11

12 **CONCLUSION**

13 For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.

14 A certificate of appealability will not issue. *See* 28 U.S.C. 2253(c). This is not a case in

15 which "reasonable jurists would find the district court's assessment of the constitutional claims

16 debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

17 The Clerk shall enter judgment in favor of respondent and close the file.

18 **IT IS SO ORDERED**

19 Dated: September ___6___, 2013.

WILLIAM ALSUP
20 UNITED STATES DISTRICT JUDGE

21

22

23

24

25 G:\PRO-SE\WHA\HC.12\THOMAS5894.RUL.hhl.wpd

26

27

28

**United States District Court**
For the Northern District of California

12